UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK SPAGNOLA,

                Petitioner,

                                    Case No. 11-cv-10329

v.

                                      Honorable Patrick J. Duggan

DEBRA SCUTT,

                Respondent.
_____/

**OPINION AND ORDER DENYING RESPONDENT'S MOTION
TO DISMISS, DENYING PETITIONER'S MOTION FOR APPOINTMENT OF
COUNSEL, HOLDING THE PETITION FOR WRIT OF HABEAS
CORPUS IN ABEYANCE, AND ADMINISTRATIVELY CLOSING THE CASE**

       Frank Spagnola ("Petitioner"), a state prisoner currently confined at the G. Robert

Cotton Correctional Facility in Jackson, Michigan, has filed a *pro se* petition for writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his conviction for

first-degree murder, Michigan Compiled Laws § 750.316.  Debra Scutt ("Respondent")

has filed a motion to dismiss, arguing that Petitioner has failed to exhaust his state-court

remedies for all of his claims.  Petitioner has moved for the appointment of counsel to

represent him in this matter.  For the reasons stated below, in lieu of dismissal, the Court

will hold the petition in abeyance and stay the proceedings, allowing Petitioner to return

to the state courts to exhaust his claims.  The Court also denies Petitioner's motion for the

appointment of counsel and administratively closes the case.

**I. Background**

This case arises from the murder of Lisa Fein, the mother of Petitioner's son,

Jacob.  The opinion of the Michigan Court of Appeals details the relevant facts, which are

presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1):

> During summer 2000, Lisa lived with her husband, Ron Fein, her son
> Jacob, and Ron Fein's son from a previous marriage, Shane Demeulenaere,
> who was just over a year younger than Jacob.  The family lived on Olive
> Branch Road, in Galien, Michigan.  June 28, 2000 was a Wednesday,
> defendant's regular day to have visitation with Jacob.  After spending time
> playing basketball with Jacob, defendant returned Jacob to the Fein
> residence sometime during the evening of June 28, 2000.  Defendant and
> Lisa spoke outside and reviewed the visitation calendar.  It was a warm
> night and there were mosquitoes out.  Defendant stayed around after he
> dropped Jacob off watching the boys catch fireflies.  He drove away at
> about 10:30 pm in his parents' Buick Park Avenue.
>
> The next day, June 29, 2000, Ron Fein left his home in late afternoon
> to go to work the midnight shift (6:00 pm to 6:00 am) at the Cook Nuclear
> Facility as he regularly did.  Lisa was home with Jacob and Shane that
> evening, planning to go to a water park the next day.  Eventually the three
> went to sleep.  In the early morning hours of June 30, 2000, Jacob woke up
> because he heard noises.  Jacob ran to the master bedroom and saw
> someone struggling with his mother.  Jacob testified that the attacker wore a
> motorcycle-type helmet with a full face shield, dark blue or black work
> clothes (long pants and a long sleeved shirt), gloves, and boots.  Jacob could
> not see the identity of the attacker.  At trial, Jacob testified that he was sure
> the attacker was not defendant, his father.  Jacob initially stated that it was
> not Ron Fein, but his testimony wavered that he did not know the identity
> of the attacker.
>
> Jacob ran from the doorway and woke up Shane.  He told Shane that
> he thought, "my mom and your dad are fighting."  Jacob ran back to the
> bedroom door but it was closed.  He banged on the door and yelled but
> there was no response.  He heard the sound of tape being pulled off a roll.
> Jacob attempted to call 911 from two different phones during the incident,
> but the first time he hung up quickly and the second time the cordless phone
> would not connect.  Jacob and Shane initially hid in the bathroom because it
> had a lock on the door.  During this time they heard loud "thumps," not like
> footsteps.

Scared, the boys left the bathroom and escaped the house through Jacob's bedroom window by opening the window and tearing away the screen by first poking it with a pencil.  Shane looked at the clock in Jacob's bedroom before they left and it said "3-0" something so he thought it was around 3:00 am when they left the house.  They ran to two different neighbors' homes to try to get help but no one answered.  They ultimately decided to go to the home of Jeanette Fein, Ron's grandmother, which was also on the street.  On their trek, they saw the helmeted figure running/jogging down the street.  Shane testified that the person was "[k]ind of short" and ran with a limp of sorts, like he had been recently hit. The boys watched the person until they lost sight of him.  Shortly thereafter, they saw a car, not a truck, go down Olive Branch Road the opposite way the person had been running.

The boys arrived at Jeanette Fein's house and she let the boys into the house.  Jacob noted it was about 3:30 am because he saw a clock in the living room.  Jacob testified that he and Shane told her "my Mom and Shane's dad were fighting."  Shane testified that Jeanette Fein did not do anything because she thought Ron Fein and Lisa were just having an argument.  Jacob did not describe the attack to Shane until they were on Jeanette Fein's couch.  Shane had not actually seen the attacker because once he left his bedroom the master bedroom door was already closed. Jacob and Shane remained at Jeanette Fein's house for the rest of the night.

Ron Fein arrived home around 6:15 am.  He entered the house through the back door and noticed that there had been a call at 6:17 am shortly before he entered the house.  He recognized the number as defendant's phone number on the caller ID.  As Ron Fein was heading toward the basement stairs he noticed that the light was on in the master bedroom because it normally was not on.  He looked in and saw that the bed was "messed up" and Lisa was not there, which was unusual.  He checked other rooms and the basement, but no one was in the house.  He noticed that the window was open in Jacob's room and the screen was busted out. There was money sitting on the top of the dresser in the master bedroom and Ron Fein's gun cabinet containing seven guns was also undisturbed. Also, both Lisa's glasses and contacts were in the house and Lisa would not have left the house without one of them.  Ron Fein then went to the basement that was also in disarray with dog food strewn about and a rug dragged out of place.  Ron Fein then exited the basement through a door that leads outside.  He noticed a roll of duct tape sitting on a woodpile that was not his duct tape.  Ron Fein testified that the tape he found was not the

3

brand he used.  He used Tuck brand duct tape purchased from Wal-Mart or Meijer later found in the house, and the brand he found on the woodpile that was not his, was later identified as Ace duct tape.

Ron Fein went back in the house and called defendant because it was odd that defendant had called his house so early in the morning and since something was obviously wrong, he wanted to call to see if defendant knew what happened.  He spoke with defendant and defendant offered to come over but Ron Fein declined and said that he was calling the police.  Ron Fein called the police and his father.  He then went to his grandmother's house to see if she knew anything and found Jacob and Shane there.  Shortly thereafter, the police arrived.  Ron Fein showed the police through his house and they interviewed him, Jacob, and Shane.  Jacob told police about the helmet-wearing intruder.  Ron Fein drove around looking for Lisa but did not find her.  Police also searched for Lisa at some point but did not locate her.

Police sought out defendant as part of their investigation of Lisa's death on the morning after the incident, June 30, 2000, after speaking with Lisa's family members at the scene.  Lieutenant Rolland Lombard testified that he arrived at defendant's parents' home at approximately 9:00 am.  Lombard testified that defendant appeared "tired" and that his responses to their questions were "slow."  Lombard and other officers observed a raised, red scratch on defendant's lower left jaw line about 1/2 inch long that appeared to have been recently inflicted.  Defendant told Lombard that he had cut himself shaving a couple weeks earlier.  Officers did not believe that defendant's shaving cut explanation for the origin of the scrape on his jaw was physically consistent with the mark they observed.

Two days later, a group of Lisa's friends and other volunteers met and selected areas to search for Lisa.  Greg Wiser, a coworker, called Ron Fein stating that his search party thought it found something near a wooded area at the edge of a bean field about a quarter mile away from Olive Branch Road.  Police later found Lisa's body buried face down in the ground in a shallow grave at that location.  Sergeant Doug Westrate testified that a blue J.P. Stevens pillowcase had been placed over Lisa's head, then a white Martex terry cloth towel covered her face.  The towel and pillowcase were held tightly in place with duct tape wrapped several times around her head over her mouth and nose.  Dr. David Allen Start, the forensic pathologist who performed the autopsy of the victim, testified that the towel, pillowcase, and duct tape were wrapped around the head and face

4

in a fashion that would occlude the airway or occlude the nose and mouth of the victim.  The autopsy revealed that the cause of Lisa's death was suffocation.

On July 10, 2000, police executed a search warrant at defendant's parents' house where he lived.  Detective Sergeant Robert Boyce was one of the officers present at the search.  He testified that police located a white Martex towel on the floor along one of the walls in the garage at defendant's house.  Glenn Moore, a forensic scientist with the Michigan State Police (MSP) testified that the white Martex towel found in defendant's garage was similar in almost every way to the white Martex towel duct taped to Lisa's face except that the two towels were manufactured one year apart (1995 and 1996).  He also testified that this type of towel was not sold for regular consumer use but exclusively for institutional use, primarily to hospitals or hotels.  Sergeant Dave Rosenau testified that he searched the Fein residence twice, on different days, and found no similar towels in the Fein house.

Boyce testified that police found three J.P. Stevens pillowcases at defendant's house, a white one in the linen closet, and two light green colored pillowcases, one found in an adult male's bedroom and one in a child's bedroom.  Moore testified that he compared these pillowcases to the blue one found on the victim.  He eliminated the white pillowcase because although it was a J.P. Stevens pillowcase, it was standard size, and the blue pillowcase was J.P. Stevens queen size.  The green pillowcases matched the blue one found over victim's head as to size (queen), brand (J.P. Stevens), and approximate date of manufacture (manufactured prior to the end of 1990).  Rosenau testified that he searched the Fein residence twice and found no similar pillowcases in the Fein house.

Michele Marfori, a forensic scientist for the MSP, analyzed fingernail clippings taken from both the right and left hands during the autopsy.  Marfori conducted a DNA analysis of brown flaky material recovered from the swabbing of the right hand and compared it to the known reference samples she received for DNA comparison.  Marfori testified that defendant's DNA matched the nail clippings profile of the right hand at all thirteen locations for the major donor.  She also testified that Ron Fein and Jeffrey Rohl, a friend of Lisa, were excluded from contributing to the DNA types obtained in the samples.

Defendant testified on his own behalf at trial.  He stated that he did

5

not kill Lisa and that the last time he saw Lisa was on the Wednesday
before she went missing, June 28, 2000 when he dropped Jacob off after his
regular visitation at about 9:00 pm.  He testified that on the night Lisa
disappeared he ran errands including picking up his mother's check from
the hospital, and then going to the Hollywood Video store before it closed
at midnight.  Defendant stated that he then went straight home and did not
leave the house at all that night.  When police came to talk to him the next
morning, he told police that the "red mark" on his jaw line happened "a
couple of days" before June 30, 2000 when the police initially came to his
house, not a couple of weeks so they must have gotten that wrong in their
reports.  Defendant testified that he loved Jacob, and he would not have
done anything to Lisa with Jacob in the house, or otherwise.

*People v. Spagnola*, No. 250488, 2009 Mich. App. LEXIS 1658, at *1-10 (Mich. Ct. App.

Aug. 4, 2009).  After a seventeen-day trial in Berrien County Circuit Court, the jury

found Petitioner guilty of first-degree murder.  Petitioner was sentenced to life in prison.

Petitioner, through counsel, filed his direct appeal with the Michigan Court of

Appeals.  He raised eight claims concerning the effectiveness of trial counsel, error in the

admission of evidence, prosecutorial misconduct, his right to present a viable defense,

and his right to an impartial jury.  The Court of Appeals affirmed his conviction and

sentence.  *Id.* at *1.  Petitioner sought leave to appeal with the Michigan Supreme Court,

raising the same eight claims plus an additional claim concerning the prosecutor's

conduct.  The Michigan Supreme Court denied his application on January 29, 2010.

*People v. Spagnola*, 485 Mich. 1080, 777 N.W.2d 173 (Mich. 2010).  Petitioner filed his

habeas petition on January 27, 2011.

## II. Discussion

The doctrine of exhaustion of state remedies requires state prisoners to fairly

6

present all of their claims to the state court before raising their claims in a habeas corpus

petition. *See* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.

Ct. 1728, 1732 (1999). For state prisoners in Michigan, this means that they must present

each claim to the Michigan Court of Appeals and to the Michigan Supreme Court before

filing a federal habeas corpus petition. *See Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir.

2009). "Fair presentation requires that the state courts be given the opportunity to see

both the factual and legal basis for each claim." *Id.* at 414-415. The burden is on the

prisoner to prove exhaustion. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

Petitioner admits that he has not exhausted all of his issues in the state courts.

Specifically, Petitioner admits that claims ten through seventeen were not exhausted.

Petition 98-102. Claim nine was not properly raised in the Court of Appeals, and thus,

was not considered by that court. *See* Petition 98. The Court finds that these claims are

unexhausted under 28 U.S.C. § 2254(b)(1)(A).

A federal district court generally should dismiss a "mixed" habeas petition, that is,

one containing both exhausted and unexhausted claims, "leaving the prisoner with the

choice of returning to state court to exhaust his claims or amending and resubmitting the

habeas petition to present only exhausted claims to the district court." *Rose v. Lundy*, 455

U.S. 509, 510, 522, 102 S. Ct. 1198, 1199 (1982). The exhaustion requirement, however,

is not a jurisdictional prerequisite for bringing a habeas petition. *Granberry v. Greer*, 481

U.S. 129, 134-35, 107 S. Ct. 1671, 1673-75 (1987). For example, an unexhausted claim

may be considered if it is so plainly meritless that addressing it would be efficient and

would not offend federal-state comity.  28 U.S.C. § 2254(b)(2); *Prather v. Rees*, 822 F.2d

1418, 1422 (6th Cir. 1987).  Federal district courts also possess the authority to issue

stays while a habeas petitioner pursues state remedies for previously unexhausted claims.

*See Rhines v. Weber*, 544 U.S. 269, 275-76, 125 S. Ct. 1528, 1534 (2005).  Stay and

abeyance are permissible when: (1) there was good cause for the petitioner's failure to

exhaust his claims first in state court; (2) the unexhausted claims are not plainly meritless;

and (3) the petitioner is not engaged in abusive litigation tactics or intentional delay.  *Id.*

at 277-78, 125 S. Ct. at 1535.

        Petitioner has available remedies in the Michigan courts which must be exhausted

before proceeding in federal court.  For example, he may file a motion for relief from

judgment pursuant to Michigan Court Rule 6.500 with the state trial court and pursue his

unexhausted claims in the state appellate courts as necessary.  His unexhausted claims

should therefore be addressed to, and considered by, the state courts in the first instance.

        The remaining question is whether the Court should dismiss the mixed habeas

petition without prejudice or stay the proceedings to allow Petitioner to fully exhaust state

remedies.  The Court finds that  dismissal of the petition would render subsequent

petitions untimely under the one-year statute of limitations.  *See* 28 U.S.C. § 2244(d)(1).

The filing of a federal habeas corpus petition does not trigger 28 U.S.C. § 2244(d)(2) to

suspend the running of this statute of limitations.  *Duncan v. Walker*, 533 U.S. 167, 181,

121 S. Ct. 2120, 2129 (2001).  The Michigan Supreme Court denied Petitioner's

application for leave to appeal on January 29, 2010, and his convictions became final

ninety days later, on April 29, 2010.  The one-year limitations period began to run the

next day and expired on April 30, 2011.  Petitioner timely filed his federal habeas petition

on January 27, 2011, but the limitations period has now expired.  Outright dismissal of

the petition might preclude consideration of Petitioner's claims in this Court due to the

expiration of the one-year statute of limitations.

The Court concludes that stay and abeyance is the proper course of action in this

case.  *Duncan* does not preclude the district courts from "retain[ing] jurisdiction over []

meritorious claim[s] and stay[ing] proceedings pending the complete exhaustion of state

remedies", or from "deeming the limitations period tolled for [a habeas] petition as a

matter of equity."  *Id.* at 182-83, 121 S. Ct. at 2130 (Stevens, J., concurring); *see also*

*Palmer v. Carlton*, 276 F.3d 777, 780-81 (6th Cir. 2002).  Petitioner appears to argue that

his unexhausted claims were not presented in state court because his appellate attorney

was ineffective.  An appellate attorney cannot be expected to raise his or her own

ineffective assistance on appeal.  *Combs v. Coyle*, 205 F.3d 269, 276 (6th Cir. 2000).

Thus, Petitioner has asserted good cause for failing previously to present these claims in

state court.  Petitioner's claims do not appear to be plainly meritless, and he has not

engaged in intentionally dilatory tactics.  Accordingly, a stay of the proceedings, rather

than dismissal, is appropriate.  *See Rhines*, 544 U.S. at 277-78, 125 S. Ct. at 1535.

When a district court determines that a stay is appropriate pending exhaustion of

state court remedies, the district court "should place reasonable time limits on a

petitioner's trip to state court and back."  *Id.* at 278, 125 S. Ct. at 1535.  To ensure that

Petitioner does not delay in exhausting his state court remedies, the Court imposes time limits within which he must proceed. Petitioner must present his claims in state court within sixty days from the date of this order. He must also ask this Court to lift the stay within sixty days of exhausting his state-court remedies. If the conditions of the stay are not met, the stay may be vacated *nunc pro tunc* as of the date it was entered, and the petition may be dismissed. *See Palmer*, 276 F.3d at 781.

Petitioner seeks the appointment of counsel, claiming that he can no longer afford counsel, that the issues in this case are complex, and that he has limited legal knowledge. Petitioner, however, has no absolute right to be represented by counsel on federal habeas corpus review. *Abdur-Rahman v. Mich. Dep't of Corrections*, 65 F.3d 489, 492 (6th Cir. 1995). Nor does he have a constitutional right to counsel when seeking post-conviction relief in the state courts. *Murray v. Giarratano*, 492 U.S. 1, 7-8, 109 S. Ct. 2765, 2768-69 (1989); *People v. Walters*, 463 Mich. 717, 721, 624 N.W.2d 922, 924 (Mich. 2001) (per curiam). "'[A]ppointment of counsel in a civil case is . . . a matter within the discretion of the court. It is a privilege and not a right.'" *Childs v. Pellegrin*, 822 F.2d 1382, 1384 (6th Cir. 1987) (quoting *United States v. Madden*, 352 F.2d 792, 793 (9th Cir. 1965)). Review of the pleadings in this case demonstrates that Petitioner has been able to clearly articulate the legal and factual basis for his claims before the state courts and this Court. The Court has not yet concluded that either discovery or an evidentiary hearing is necessary. Accordingly, the Court believes that the interests of justice do not require the appointment of counsel to represent Petitioner at this time. *See* 18 U.S.C. §

10

3006A(a)(2)(B); 28 U.S.C. foll. § 2254, Rules 6(a) and 8(c).  Petitioner's request for

counsel shall therefore be denied.

### III. Conclusion

Petitioner has failed to fully exhaust his state-court remedies with respect to some

of the claims presented in his habeas corpus petition.  The Court concludes, however, that

dismissal of the petition could deprive Petitioner of the opportunity to seek habeas relief.

Accordingly;

**IT IS ORDERED** that Respondent's motion to dismiss is **DENIED**.

**IT IS FURTHER ORDERED** that the petition for writ of habeas corpus is

**STAYED**.  The Court's stay is conditioned on Petitioner filing his appeal of unexhausted

claims within **sixty (60) days** of the date of this order.  If Petitioner is unsuccessful in

state court and wishes to re-open this case, he must file an amended habeas petition and a

motion to lift the stay, using the same case number and caption that appears on this order.

The motion to lift the stay must be filed within **sixty (60) days** of exhausting state

remedies.

To avoid administrative difficulties, the Court **ORDERS** the Clerk of the Court to

**CLOSE** this case for statistical purposes only.  Nothing in this Order or in the related

docket entry shall be considered a dismissal or disposition of this matter.

**IT IS FURTHER ORDERED** that Petitioner's motion for the appointment of

counsel is **DENIED**.  The Court will bear in mind Petitioner's request if, upon further

review of the pleadings and the state court record, the Court determines that appointment

of counsel is necessary.  Petitioner need not file additional motions.

**SO ORDERED.**

s/PATRICK J. DUGGAN<br>
UNITED STATES DISTRICT JUDGE

Dated: December 14, 2011

Copies to:

Frank Spagnola, #459889
G. Robert Cotton Correctional Facility
3500 North Elm Road
Jackson, MI 49201

John S. Pallas, A.A.G.