UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK SPAGNOLA,

               Petitioner,                Civil Action No. 11-CV-10329

v.                                 HON. BERNARD A. FRIEDMAN

RANDALL HAAS,

               Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

This matter is before the Court on Petitioner Frank Spagnola's *pro se* petition for a writ of habeas corpus. Petitioner challenges his convictions for first-degree premeditated murder, raising ten claims for relief. Respondent has filed an answer arguing that a portion of Petitioner's ineffective assistance of counsel and his prosecutorial misconduct claims are unexhausted and that all of his claims are meritless. For the reasons explained, the Court denies the petition.

## I.      BACKGROUND

Petitioner's conviction arises from the murder of Lisa Fein. The Michigan Court of Appeals summarized the circumstances leading to his conviction as follows:

> During summer 2000, Lisa lived with her husband, Ron Fein, her son Jacob [then 11-years old], and Ron Fein's son from a previous marriage, Shane Demeulenaere, who was just over a year younger than Jacob. The family lived on Olive Branch Road, in Galien, Michigan. June 28, 2000 was a Wednesday, defendant's regular day to have visitation with Jacob. After spending time playing basketball with Jacob, defendant returned Jacob to the Fein residence sometime during the evening of June 28, 2000. Defendant and Lisa spoke outside and reviewed the visitation calendar. It was a warm night and there were mosquitoes out.

Defendant stayed around after he dropped Jacob off watching the boys catch fireflies.  He drove away at about 10:30 pm in his parents' Buick Park Avenue.

The next day, June 29, 2000, Ron Fein left his home in late afternoon to go to work the midnight shift (6:00 pm to 6:00 am) at the Cook Nuclear Facility as he regularly did.   Lisa was home with Jacob and Shane that evening, planning to go to a water park the next day.   Eventually the three went to sleep.   In the early morning hours of June 30, 2000, Jacob woke up because he heard noises. Jacob ran to the master bedroom and saw someone struggling with his mother.   Jacob testified that the attacker wore a motorcycle-type helmet with a full face shield, dark blue or black work clothes (long pants and a long sleeved shirt), gloves, and boots.  Jacob could not see the identity of the attacker.   At trial, Jacob testified that he was sure the attacker was not defendant, his father.   Jacob initially stated that it was not Ron Fein, but his testimony wavered that he did not know the identity of the attacker.

Jacob ran from the doorway and woke up Shane. He told Shane that he thought, "my mom and your dad are fighting."   Jacob ran back to the bedroom door but it was closed.   He banged on the door and yelled but there was no response. He heard the sound of tape being pulled off a roll.  Jacob attempted to call 911 from two different phones during the incident, but the first time he hung up quickly and the second time the cordless phone would not connect.   Jacob and Shane initially hid in the bathroom because it had a lock on the door. During this time they heard loud "thumps," not like footsteps.

Scared, the boys left the bathroom and escaped the house through Jacob's bedroom window by opening the window and tearing away the screen by first poking it with a pencil.  Shane looked at the clock in Jacob's bedroom before they left and it said "3-0" something so he thought it was around 3:00 a.m. when they left the house.  They ran to two different neighbors' homes to try to get help but no one answered.  They ultimately decided to go to the home of Jeanette Fein, Ron's grandmother, which was also on the street.   On their trek, they saw the helmeted figure running/jogging down the street.  Shane testified that the person was "[k]ind of short" and ran with a limp of sorts, like he had been recently hit. The boys watched the person until they lost sight of him.   Shortly thereafter, they saw a car, not a truck, go down Olive Branch Road the opposite way the person had been running.

2

The boys arrived at Jeanette Fein's house and she let the boys into the house. Jacob noted it was about 3:30 am because he saw a clock in the living room. Jacob testified that he and Shane told her "my Mom and Shane's dad were fighting." Shane testified that Jeanette Fein did not do anything because she thought Ron Fein and Lisa were just having an argument. Jacob did not describe the attack to Shane until they were on Jeanette Fein's couch. Shane had not actually seen the attacker because once he left his bedroom the master bedroom door was already closed. Jacob and Shane remained at Jeanette Fein's house for the rest of the night.

Ron Fein arrived home around 6:15 am. He entered the house through the back door and noticed that there had been a call at 6:17 am shortly before he entered the house. He recognized the number as defendant's phone number on the caller ID. As Ron Fein was heading toward the basement stairs he noticed that the light was on in the master bedroom because it normally was not on. He looked in and saw that the bed was "messed up" and Lisa was not there, which was unusual. He checked other rooms and the basement, but no one was in the house. He noticed that the window was open in Jacob's room and the screen was busted out. There was money sitting on the top of the dresser in the master bedroom and Ron Fein's gun cabinet containing seven guns was also undisturbed. Also, both Lisa's glasses and contacts were in the house and Lisa would not have left the house without one of them. Ron Fein then went to the basement that was also in disarray with dog food strewn about and a rug dragged out of place. Ron Fein then exited the basement through a door that leads outside. He noticed a roll of duct tape sitting on a woodpile that was not his duct tape. Ron Fein testified that the tape he found was not the brand he used. He used Tuck brand duct tape purchased from Wal-Mart or Meijer later found in the house, and the brand he found on the woodpile that was not his, was later identified as Ace duct tape.

Ron Fein went back in the house and called defendant because it was odd that defendant had called his house so early in the morning and since something was obviously wrong, he wanted to call to see if defendant knew what happened. He spoke with defendant and defendant offered to come over but Ron Fein declined and said that he was calling the police. Ron Fein called the police and his father. He then went to his grandmother's house to see if she knew anything and found Jacob and Shane there. Shortly thereafter, the police arrived. Ron Fein showed the police through his house and they interviewed him, Jacob, and Shane. Jacob told police about the helmet-wearing intruder. Ron Fein drove around looking for

Lisa but did not find her. Police also searched for Lisa at some point but did not locate her.

Police sought out defendant as part of their investigation of Lisa's death on the morning after the incident, June 30, 2000, after speaking with Lisa's family members at the scene. Lieutenant Rolland Lombard testified that he arrived at defendant's parents' home at approximately 9:00 am. Lombard testified that defendant appeared "tired" and that his responses to their questions were "slow." Lombard and other officers observed a raised, red scratch on defendant's lower left jaw line about ½ inch long that appeared to have been recently inflicted. Defendant told Lombard that he had cut himself shaving a couple weeks earlier. Officers did not believe that defendant's shaving cut explanation for the origin of the scrape on his jaw was physically consistent with the mark they observed.

Two days later, a group of Lisa's friends and other volunteers met and selected areas to search for Lisa. Greg Wiser, a coworker, called Ron Fein stating that his search party thought it found something near a wooded area at the edge of a bean field about a quarter mile away from Olive Branch Road. Police later found Lisa's body buried face down in the ground in a shallow grave at that location. Sergeant Doug Westrate testified that a blue J.P. Stevens pillowcase had been placed over Lisa's head, then a white Martex terry cloth towel covered her face. The towel and pillowcase were held tightly in place with duct tape wrapped several times around her head over her mouth and nose. Dr. David Allen Start, the forensic pathologist who performed the autopsy of the victim, testified that the towel, pillowcase, and duct tape were wrapped around the head and face in a fashion that would occlude the airway or occlude the nose and mouth of the victim. The autopsy revealed that the cause of Lisa's death was suffocation.

On July 10, 2000, police executed a search warrant at defendant's parents' house where he lived. Detective Sergeant Robert Boyce was one of the officers present at the search. He testified that police located a white Martex towel on the floor along one of the walls in the garage at defendant's house. Glenn Moore, a forensic scientist with the Michigan State Police (MSP) testified that the white Martex towel found in defendant's garage was similar in almost every way to the white Martex towel duct taped to Lisa's face except that the two towels were manufactured one year apart (1995 and 1996). He also testified that this type of towel was not sold for regular consumer use but exclusively for institutional use, primarily to hospitals or hotels. Sergeant Dave Rosenau testified

4

that he searched the Fein residence twice, on different days, and found no similar towels in the Fein house.

Boyce testified that police found three J.P. Stevens pillowcases at defendant's house, a white one in the linen closet, and two light green colored pillowcases, one found in an adult male's bedroom and one in a child's bedroom. Moore testified that he compared these pillowcases to the blue one found on the victim. He eliminated the white pillowcase because although it was a J.P. Stevens pillowcase, it was standard size, and the blue pillowcase was J.P. Stevens queen size. The green pillowcases matched the blue one found over victim's head as to size (queen), brand (J.P. Stevens), and approximate date of manufacture (manufactured prior to the end of 1990). Rosenau testified that he searched the Fein residence twice and found no similar pillowcases in the Fein house.

Michele Marfori, a forensic scientist for the MSP, analyzed fingernail clippings taken from both the right and left hands during the autopsy. Marfori conducted a DNA analysis of brown flaky material recovered from the swabbing of the right hand and compared it to the known reference samples she received for DNA comparison. Marfori testified that defendant's DNA matched the nail clippings profile of the right hand at all thirteen locations for the major donor. She also testified that Ron Fein and Jeffrey Rohl, a friend of Lisa, were excluded from contributing to the DNA types obtained in the samples.

Defendant testified on his own behalf at trial. He stated that he did not kill Lisa and that the last time he saw Lisa was on the Wednesday before she went missing, June 28, 2000 when he dropped Jacob off after his regular visitation at about 9:00 pm. He testified that on the night Lisa disappeared he ran errands including picking up his mother's check from the hospital, and then going to the Hollywood Video store before it closed at midnight. Defendant stated that he then went straight home and did not leave the house at all that night. When police came to talk to him the next morning, he told police that the "red mark" on his jaw line happened "a couple of days" before June 30, 2000 when the police initially came to his house, not a couple of weeks so they must have gotten that wrong in their reports. Defendant testified that he loved Jacob, and he would not have done anything to Lisa with Jacob in the house, or otherwise.

*People v. Spagnola*, No. 250488, 2009 WL 2382670, *1–4 (Mich. Ct. App. Aug. 4, 2009).

Petitioner was convicted by a jury in Berrien County Circuit Court of first-degree premeditated murder.   Mich. Comp. Laws § 750.316.   On July 14, 2003, he was sentenced to life imprisonment.

In May 2004, petitioner filed a motion for new trial.   The trial court denied the motion in all respects, with the exception of the ineffective assistance of counsel claim. *Spagnola*, 2009 WL 2382670 at *4.   The ineffective assistance of counsel claim focused on issues surrounding the DNA evidence.   *Id.*   The trial court conducted a two-week hearing in 2005, following which the trial court required the release of DNA testing data for review by Petitioner's experts.   *Id.*   A *Ginther* hearing was held in December 2007.   *Id.*   Following the hearing, the trial court issued an extensive opinion and order denying the motion for new trial.

Petitioner then filed an appeal of right in the Michigan Court of Appeals, raising eight claims for relief concerning the effectiveness of trial counsel, error in the admission of evidence, prosecutorial misconduct, his right to present a viable defense, and his right to an impartial jury.   The Court of Appeals affirmed his conviction and sentence.   *Id.* at * 1. Petitioner sought leave to appeal with the Michigan Supreme Court, raising the same eight claims plus an additional claim concerning the prosecutor's conduct.   The Michigan Supreme Court denied his application on January 29, 2010.   *People v. Spagnola*, 485 Mich. 1080, 777 N.W.2d 173 (Mich.2010).

Petitioner filed a habeas petition on January 27, 2011.   Respondent filed a motion to dismiss on the ground that the petition contained several unexhausted claims.   The Court stayed the petition, allowing petitioner to return to trial court to exhaust his unexhausted claims. *Spagnola v. Scutt,* 2011 WL 6217794 (E.D. Mich. Dec. 14, 2011).

6

Petitioner filed a motion for relief from judgment in the Berrien County Circuit Court.   The trial court denied the motion.   *People v. Spagnola*, No. 2002-403913 (Berrien Cty. Cir. Ct. July 5, 2012) (ECF No. 27-5).   The Michigan Court of Appeals and Michigan Supreme Court denied Petitioner leave to appeal the trial court's denial of his motion for relief from judgment.   *People v. Spagnola*, No. 314053 (Mich. Ct. App. Sept. 24, 2013); *People v. Spagnola*, 492 Mich. 978 (2014).

Petitioner then filed a motion to lift the stay and filed an amended petition.   The Court lifted the stay and ordered respondent to file an answer to the petition, which he has now done.   The petition raises these claims:

I. Petitioner was denied the effective assistance of counsel guaranteed by the Sixth Amendment, made applicable to the states through the Fourteenth Amendment of the United States Constitution, where his trial attorney, with no strategic purpose, did not investigate and, therefore, did not discover information that would have permitted him to successfully challenge the DNA evidence and the statistics.

II. The repeated introduction of and substantial emphasis on clearly testimonial statements by decedent prior to her death purporting to implicate petitioner violated petitioner Spagnola's federal constitutional rights to confront and cross-examine his accuser. (United States Constitution Amendments VI, XIV).

III. The trial court's exclusion of a substantial amount of critical defense evidence suggesting another suspect might have motive to commit the murder for which petitioner Spagnola was convicted, in part through acceptance of the prosecution's argument that the other suspect was not on trial, denied petitioner his constitutional due process right to present a defense, in violation of the V, VI, XIV Amendments to the United States Constitution.

IV. Petitioner Spagnola's federal constitutional rights to due process, to remain silent, and to an attorney (United States Constitution, Amendments V, VI, XIV) were violated when the prosecution impermissibly elicited evidence that petitioner exercised his right to remain silent, his right to an attorney, and his right to be free from warrantless searches, impermissibly inferring that asserting these rights was evidence of petitioner's guilt.

7

V.      Petitioner Spagnola's conviction must be reversed where the Berrien county sheriff's department and the prosecution denied petitioner his federal constitutional rights to due process of law and to a fair trial by failing to investigate the case in good faith (United States Constitution, Amendment V).

VI.     Petitioner Spagnola was denied his right to a fair trial under the federal constitution (Amendment XIV) when the prosecutor engaged in severe and repeated outcome-determinative misconduct.

VII.    Petitioner Spagnola was denied the effective assistance of counsel pursuant to the Sixth and Fourteenth Amendments of the United States Constitution, where his trial attorney failed to investigate and confront the People's theory that decedent's scratch of the petitioner while he was wearing a full face helmet left a red mark which was the origin of the DNA.

VIII.   Petitioner Spagnola was denied his constitutional right to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution when a juror, who was ultimately selected and became the jury foreperson, failed to disclose that he had previously formed an opinion that petitioner was guilty.

IX.     Petitioner Spagnola was denied his right to the effective assistance of counsel under the United States Constitution, Amendments Six and Fourteen, when trial counsel Parish failed to pursue an attack on the broken chain of evidence, which, if successful, would have brought about a reasonable probability of a different verdict.

X.      Petitioner Frank Spagnola's constitutional rights to a fair and impartial trial and due process of law, under the Sixth and Fourteenth Amendments to the United States Constitution, were violated when the prosecutor at trial solicited false testimony to incriminate petitioner Spagnola, and committed repeated acts of out-come determinative misconduct to further incriminate petitioner.

8

## II.    STANDARD

Petitioner's claims are reviewed against the standards established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [United States Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"   *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).   "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413).

However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous. . . . The state court's application must have been 'objectively unreasonable.'" *Id.* at

520–21 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). "A state court's determination

that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86,

101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

> Section 2254(d) reflects the view that habeas corpus is a guard
> against extreme malfunctions in the state criminal justice systems,
> not a substitute for ordinary error correction through appeal. . . . As a
> condition for obtaining habeas corpus from a federal court, a state
> prisoner must show that the state court's ruling on the claim being
> presented in federal court was so lacking in justification that there
> was an error well understood and comprehended in existing law
> beyond any possibility for fairminded disagreement.

*Id.* at 102–03 (internal quotation and citation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of

whether the state court's decision comports with clearly established federal law as determined by

the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412.

However, this "does not require citation of [Supreme Court] cases—indeed, it does not even

require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the

state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Relatedly, "while

the principles of 'clearly established law' are to be determined solely by resort to Supreme Court

rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of

a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing

*Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)).

Finally, a federal habeas court must presume the correctness of state court factual

determinations, see 28 U.S.C. § 2254(e)(1), and a petitioner may rebut this presumption only with

clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998). Put differently, only factual determinations that are "objectively unreasonable in light of the evidence presented in the state-court proceeding" will be overturned. *McKinney v. Ludwick*, 649 F.3d 484, 488 (6th Cir. 2011) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

## III.   DISCUSSION

### a.   <u>Ineffective Assistance of Counsel (Claims I, VII, and IX)</u>

Petitioner seeks habeas relief on the grounds that his trial attorney was ineffective for failing to: (i) investigate and discover information that would have permitted him to successfully challenge the DNA evidence and related statistics; (ii) investigate and confront the prosecution's theory that the source of the DNA was a scratch to petitioner's face, caused when Petitioner was wearing a full face mask; and (iii) challenge the handling of the DNA evidence.

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). The standard for obtaining relief is "difficult to meet." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013). In the context of an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

An ineffective assistance of counsel claim must meet two prongs: a petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish deficient representation, a petitioner must demonstrate

11

that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694.

First, petitioner's claims focus on his attorney's failure to investigate and challenge DNA evidence and statistics. These claims were the subject of a lengthy evidentiary hearing which included testimony from the defense's expert witnesses and defense counsel. Following the hearing, the trial court issued a 54-page opinion that carefully summarized and evaluated the testimony adduced at the evidentiary hearing and found that neither *Strickland* prong had been satisfied. On direct appeal, the Michigan Court of Appeals also denied petitioner's claim that counsel's handling of statistics-related DNA evidence was ineffective.

The Michigan Court of Appeals observed that counsel made a strategic decision to acknowledge the "uncontroverted DNA evidence that defendant's DNA was found under or on" the victim's fingernails on her right hand and to instead challenge the means of transfer. *Spagnola*, 2009 WL 2382670 at *6. It also found reasonable counsel's decision to choose "a path that allowed him not to have to challenge the near insurmountable probabilities involved that somehow the DNA was not defendant's DNA . . . and instead . . . argue that the DNA was transferred onto Lisa through totally innocent means, i.e. direct transfer as defendant and Lisa reviewed the calendar, through Jacob or his clothes, or even through a mosquito swat." *Id.*

The record supports the decision of the Michigan Court of Appeals. Defense counsel's strategy to argue that the DNA evidence was transmitted innocently was not objectively unreasonable. It was not obviously inferior to the strategy of attacking the source of the DNA. And, as the trial court observed, attacking the DNA evidence on both fronts may have been

12

confusing and viewed by the jury as contradictory. Because the record supports the reasonableness of trial counsel's strategic decision, his performance did not fall below the bar of professionally competent assistance and habeas relief is denied on this claim.

Next, petitioner argues that counsel was ineffective in failing to challenge the prosecution's theory that the source of the DNA from the victim's fingernail was a scratch on petitioner's face. Petitioner provided affidavits to the Michigan Court of Appeals from three biomechanical experts concluding that because a full face shield helmet fits so snugly that even a single finger cannot fit under it, any scratch inflicted would have been vertical rather than horizontal; and any possible access would be on the tip of the chin, not the jaw line. *Id.* at *35. Petitioner argues that his counsel was ineffective in failing to raise these issues at trial.

The Michigan Court of Appeals rejected the assumptions upon which petitioner's argument was based. The trial court pointed to the "dearth of evidence" regarding the helmet: no evidence regarding the type, size, or shape of the helmet or face shield was presented at trial. *Id.* The attacker's helmet was never recovered. The Michigan Court of Appeals further observed that

> it can never be known whether the helmet was momentarily knocked to its side, back, or up, providing an instant of time for the victim to scratch at her attacker with her right hand . . . it can never be known whether the helmet was even knocked totally off during the struggle, or even if the assailant actually took the helmet off himself during the struggle for some reason.

*Id.* Without this evidence, the trial court rejected the expert testimony as based "almost wholly on speculative facts and assumptions." *Id.* at *36. The testimony was inadmissible under Mich. R. Evid. 703 and defense counsel was not ineffective in failing to present inadmissible evidence. *Id.* Deferring to this decision, Court will not find that the trial court unreasonably determined that petitioner failed to demonstrate that his counsel's performance was deficient.

13

Finally, petitioner argues that counsel was ineffective in failing to pursue exclusion of the fingernail evidence on the ground that there was a break in the chain of custody.   Petitioner raised this claim for the first time in his motion for relief from judgment to the trial court.[1]   The trial court held that counsel was not ineffective for failing to object to admission of the fingernail evidence.   The trial court held that the evidence was properly admitted because, there was "no substantial break in the chain of custody," and "[a]ny imperfections in the chain go to the weight of the evidence, not its admissibility."   Rule 5 Materials, July 5, 2012, Order p. 13.   Defense counsel did not challenge the admissibility of the fingernail-related DNA evidence, but "hammered away at the deficiencies in the chain of custody and the ways in which the evidence could have been contaminated."   *Id.* at n.11.   The trial court held that counsel was not ineffective.

The evidence was admissible under state law as determined by the trial court. Counsel cannot be ineffective for failing to object to the admission of properly admitted evidence. *See Bradley v. Birkett*, 192 F. App'x 468, 475 (6th Cir. 2006).   Therefore, counsel was not ineffective in failing to raise a meritless objection.   Habeas relief is denied on this claim.

### b.  Confrontation Clause (Claim II)

Petitioner next argues that his rights under the Confrontation Clause were violated when several witnesses testified as to out-of-court statements made by Lisa Fein regarding both her custody battle with petitioner and her fear of petitioner.

---

[1]  Respondent argues that this and several of petitioner's other claims are procedurally defaulted.   The Court finds it unnecessary to address the question of procedural default.   It is not a jurisdictional bar to review of the merits of an issue, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003).   A procedural bar would not affect the outcome of the case, so it is more efficient to proceed to the merits.

The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."   U.S. Const. amend. VI.   The Confrontation Clause bars testimonial out-of-court statements unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him.   *Crawford v. Washington*, 541 U.S. 36, 68 (2004).   "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."   *Davis v. Washington*, 547 U.S. 813, 821 (2006).

The Confrontation Clause has no application to non-testimonial statements. *Whorton v. Bockting*, 549 U.S. 406, 420 (2007).   To determine whether a statement is testimonial, a court asks "whether the declarant intends to bear testimony against the accused.   That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate [her] statement being used against the accused in investigating and prosecuting the crime."   *Berry v. Capello*, 576 F. App'x 579, 585 (6th Cir. 2014) (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)).

First, petitioner argues that his right of confrontation was violated by testimony regarding Lisa Fein's comments made during the course of a custody dispute concerning hers and petitioner's son, Jacob.   The trial court allowed testimony from Lisa's attorney regarding petitioner's treatment of Jacob and its impact on Lisa's life, including that he repeatedly returned Jacob late after visitation; he cut Jacob's hair against Lisa's wishes; he was loud and threatening to Lisa in public places; he threatened Lisa with physical harm; he said negative things about Lisa to Jacob outside her presence; he physically abused Jacob; and Lisa had requested suspension of petitioner's visitation with Jacob.   The trial court admitted this testimony to show discord

15

between the parties and the effect of these proceedings on petitioner, not for the truth of the matter

asserted.   The Michigan Court of Appeals held that the testimony was properly admitted:

> In the present case, the challenged testimony regarding Lisa's allegations in the custody litigation did not violate defendant's right of confrontation.   When read in context, it is clear that the testimony was not hearsay because it was not offered to prove the truth of the matter asserted.   MRE 801(c).   The testimony was not offered to establish the truth of any of the allegations Lisa waged against defendant throughout the course of the custody litigation – that defendant repeatedly brought Jacob home late despite visitation guidelines, licked his wounds, cut his hair, slept in the same bed with Jacob, or even failed to pay his child support on time.   Rather, the prosecutor offered the evidence to establish and explain the discord between defendant and Lisa caused by a long-term heated custody dispute, defendant's increasing frustration with Lisa as well as the effect it had on him over the years, and defendant's motive to kill Lisa to get custody of their son Jacob.   Because the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted, this testimony did not violate defendant's right of confrontation.   Thus, the trial court did not plainly err when it admitted testimony regarding Lisa's allegations in the custody litigation.

*Spagnola*, 2009 WL 2382670 at *18.

The Confrontation Clause "does not bar the use of testimonial statements for

purposes other than establishing the truth of the matter asserted."   *Crawford*, 541 U.S. at 59 n.9

(2004).   Thus, "admission of a testimonial statement in and of itself is not enough to trigger a

violation of the Confrontation Clause.   Instead, the statement must be used as hearsay—in other

words, it must be offered for the truth of the matter asserted."   *United States v. Pugh*, 405 F.3d

390, 399 (6th Cir. 2005); *accord United States v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004)

("Because the statements were not offered to prove the truth of the matter asserted, the

Confrontation Clause does not apply.").   The Court has no basis for questioning the trial court's

decision that the testimony at issue was not offered for a hearsay purpose.   Petitioner, therefore,

16

has not established a Confrontation Clause violation.   Moreover, as discussed below, to the extent that the Court erred in admitting this testimony, any error was harmless.

Second, petitioner challenges testimony from several of Lisa's friends that she had expressed fear of petitioner.   The Michigan Court of Appeals held that Lisa's statements were not testimonial in nature and, therefore, were not barred by the Confrontation Clause.   The trial court reasoned that the statements were "not made as solemn declarations or affirmations for the purpose of establishing any past fact" where they were "casual remarks made to friends, neighbors or acquaintances . . . during . . . casual conversations with friends and neighbors, or other similar informal contexts."   *Spagnola*, 2009 WL 2382670 at *19.   The trial court also held that a reasonable witness would not anticipate that Lisa's casual statements made in informal circumstances would later be used against Petitioner in investigating and prosecuting the crime. *Id.*   This determination is supported by the record.   None of the circumstances relayed by Petitioner's friends indicated the remarks were testimonial in nature.

Moreover, even if the challenged testimony violated the Confrontation Clause, the error was harmless.   A violation of the Confrontation Clause is subject to harmless error analysis. *See Lilly v. Virginia*, 527 U.S. 116, 140 (1999).   On habeas review, to determine whether an error is harmless a court must ask whether the error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"   *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).   "To determine the effect of the error under *Brecht*, [the Court should] consider both the impact of the improperly admitted evidence and the overall weight of the evidence presented at trial."   *Peterson v. Warren*, 311 F. App'x 798, 805 (6th Cir. 2009).   Factors to be considered in determining whether a Confrontation Clause error was harmless under *Brecht* include:

17

> "(1) 'the importance of the witness' testimony in the prosecution's case,' (2) 'whether the testimony was cumulative,' (3) 'the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points,' (4) 'the extent of cross-examination otherwise permitted,' and (5) 'the overall strength of the prosecution's case.'"

*Vasquez v. Jones*, 496 F.3d 564, 574 n.8 (6th Cir. 2007) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684).

The Michigan Court of Appeals found that "even if the trial court's admission of one or more of Lisa's statements was error, the evidence of defendant's guilt was so overwhelming, any error would have been harmless." *Spagnola*, 2009 WL 2382670 at *20.   In light of the strong evidence against Petitioner, exclusive of Lisa's statements, the record demonstrates that the Michigan Court of Appeals found that the admission of these statements, if error, was harmless.   Habeas relief is denied on this claim.

### c.  <u>Right to Present a Defense (Claim III)</u>

Petitioner argues that he was denied his right to present a defense when the trial court excluded evidence crucial to his defense.   First, he claims that the testimony of Lori Maitland, Jeff Rohl, and Cindy Lannan would have shown that the victim's relationship with her husband was acrimonious and that Ron Fein had a motive to kill her.   Second, he argues the trial court impermissibly limited the defense's opportunity to rehabilitate Jacob through prior consistent statements.   Third, Petitioner argues that the trial court erred when it limited his ability to impeach prosecution witness Matthew Ross by showing that Ross was given a "free pass" on a previous robbery in exchange for his testimony at trial and that he had been a "snitch" in a previous case.

The right of a defendant to present a defense has long been recognized as "a fundamental element of due process of law." *Washington v. Texas,* 388 U.S. 14, 19 (1967).   It is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).   But the Supreme Court also recognizes that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Nevada v. Jackson*, ___ U.S. ___, 133 S. Ct. 1990, 1992 (2013) (internal quotation omitted).   A defendant "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissable under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).   State rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (internal quotation omitted).   "A defendant's interest in presenting . . . evidence may thus bow to accommodate other legitimate interest in the criminal trial process." *Id.*   The exclusion of evidence has been found to be "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id.*

Petitioner raised his claim that he was denied the right to present a defense on direct appeal in trial court.   The Michigan Court of Appeals, in a comprehensive and well-reasoned opinion, found no constitutional violation.   *Spagnola*, 2009 WL 2382670 at *20–24.   The court addressed the proffered testimony regarding Lisa and Ron Fein's allegedly rocky relationship. Defense counsel made an offer of proof that Lori Maitland, Jeff Rohl, and Cindy Lannan would have testified that Lisa and Ron had a rocky marriage and that Lisa had talked about leaving Ron. The trial court excluded most of the testimony because it was hearsay testimony improperly offered for the truth of the matter asserted or irrelevant.   The trial court allowed limited testimony

19

from Cindy Lannan, permitting her to testify about Lisa's intention to find her own residence and that separation would be a good idea, but it did not allow extensive testimony about the details of Lisa and Ron's relationship.

The Michigan Court of Appeals affirmed the trial court's evidentiary rulings, finding that Maitland's and Rohl's proffered testimony was properly excluded as hearsay. *Id.* at *21. With respect to Cindy Lannan testimony, the Michigan Court of Appeals held that the trial court properly limited her testimony and found the excluded evidence inadmissible as hearsay. *Id.* Petitioner fails to show that the Michigan trial court's evidentiary ruling was "so egregious that it result[ed] in a denial of fundamental fairness . . . and thus warrant[s] habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Next, petitioner argues the trial court impermissibly limited the defense's opportunity to rehabilitate Jacob Spagnola by using prior consistent statements. On direct examination, Jacob testified that he told his step-brother Shane that his mother and Shane's father, Ron Fein, were fighting. Jacob also testified that when he and Shane fled to Ron's grandmother's house, Jacob told her that his mother and Shane's father were fighting. Jacob also testified that the person who was fighting with his mother was not Ron Fein and that he did not get a good look at the person fighting with his mother; he could not even discern whether the figure was a man or woman.

Defense counsel tried to question Jacob about his prior statements identifying the individual as Ron Fein. The trial court allowed defense counsel a single line of inquiry regarding Jacob's statement to Shane, but did not allow defense counsel to question Jacob about his statement to Ron's grandmother under Michigan Rule of Evidence 403 because it had already been

covered once.   The trial court also held that a statement Jacob made to police later in the day did not qualify as an excited utterance under Michigan Rule of Evidence 803(2).

The Michigan Court of Appeals rejected Petitioner's argument that he was denied the right to rehabilitate Jacob's certainty that the attacker was Ron.   *Spagnola*, 2009 WL 2382670, at *22.   The Michigan Court of Appeals held that Jacob's testimony in this regard had not reflected any certainty.   *Id.*   Instead, Jacob had given conflicting testimony about whether he was able to identify the attacker.   *Id.*   In addition, the Michigan Court of Appeals held that testimony regarding Jacob's identification of the attacker as Ron were placed before the jury through Jacob's testimony about his statements to Shane and Ron's grandmother, and Shane's testimony about Jacob's statement to Ron's grandmother.   *Id.* at *23.   The Michigan Court of Appeals held that the trial court did not err in limiting defense counsel's questioning of Jacob.   *Id.*   This holding was a reasonable restriction on the admission of evidence.   As such, it did not impinge upon petitioner's right to present a defense.

Finally, petitioner argues that the trial court improperly limited his ability to impeach the testimony of Matthew Ross.   Ross testified that petitioner attempted to hire him to kill Lisa a few years prior to her death.   *Id.* at *16.   When Ross refused, petitioner paid him to plant drugs in Lisa's car in an attempt to discredit her.   *Id.*   Petitioner sought to impeach Ross's testimony in two ways.   First, he sought to present evidence that Ross benefitted from testifying against petitioner because police did not pursue armed robbery charges against him.   During the preliminary examination, Ross testified that he committed an armed robbery in Michigan in 1995. The defense argued that because Ross was not charged with this robbery after his testimony, he received a "free pass" from the prosecutor in exchange for his testimony.   The trial court found a "total lack of evidence in the record that the prosecutor had given or had the power to give Ross

21

any kind of 'free pass' regarding the" robbery.   *Id.*   The Michigan Court of Appeals affirmed this evidentiary ruling, reasoning that there was no evidence about the specific circumstances of the alleged robbery, including where it occurred.   *Id.* at *23.   In sum, the trial court's conclusion was reasonable and its evidentiary ruling does not implicate petitioner's right to present a defense.

Petitioner' also argues that the trial court erred in excluding as irrelevant testimony that Ross had assisted police in a murder case in Oregon about 22 years earlier.   Petitioner sought to introduce this evidence to rebut Ross's claim that he testified against petitioner because he had recently "found God."   Petitioner reasoned that Ross had assisted police in Oregon before he had found God and, therefore, that could not be the true reason for his testimony against petitioner. The Michigan Court of Appeals held that evidence related to the Oregon case was properly excluded because it was too far removed in time and circumstances to be relevant to petitioner's case.   *Id.* at 24.   Petitioner fails to show that the trial court's exclusion of this irrelevant evidence infringed on his right to present a defense.   Habeas relief is denied on this claim.

### d.  <u>Prosecutorial Misconduct (Claims IV, V, VI, and X)</u>

Petitioner raises five prosecutorial misconduct claims: (i) improperly elicited evidence that petitioner exercised his right to remain silent during questioning, his right to an attorney, and his right to be free from warrantless searches, and implied petitioner's guilt on this basis; (ii) failed (along with the sheriff's department) to investigate the case in good faith; (iii) testified to facts not in evidence; (iv) misstated the evidence; and (v) vouched for the credibility of prosecution witnesses.

The clearly established federal law relevant to the Court's review of a prosecutorial misconduct claim is *Darden v. Wainwright*, 477 U.S. 168 (1986).   *Parker v. Matthews*, 567 U.S. 37, ___, 132 S. Ct. 2148, 2153 (2012).   In *Darden*, the Supreme Court held that a "prosecutor's

improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181 (internal quotation marks omitted).   The Court must ask whether the Michigan Court of Appeal's decision denying petitioner's prosecutorial misconduct claims "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 132 S. Ct. at 2155 (quoting *Harrington*, 562 U.S. at 103).

First, petitioner argues that the prosecutor denied petitioner a fair trial by eliciting evidence that during interrogation petitioner exercised his right to remain silent and his right to an attorney.   The prosecutor sought to introduce testimony that petitioner's attorney was present during police questioning.   After oral argument, the trial court prohibited any testimony to the effect that petitioner did not want to speak to police without his lawyer present.   The trial court permitted officers to testify that defense counsel was present during police questioning because the trial court found it relevant, the police interview was non-custodial, and police did not give petitioner *Miranda* warnings.   *Spagnola*, 2009 WL 2382670, at *26.   Defense counsel's presence during police questioning was mentioned only twice during the seventeen-day trial.   *Id.* The Michigan Court of Appeals rejected petitioner's argument that these isolated references to petitioner's attorney amounted to improper comment on petitioner's exercise of his right to silence and right to an attorney.

It disagreed with petitioner's premise that this testimony "injected the exercise of defendant's right to silence and right to counsel at trial as substantive evidence of [petitioner's] guilt," and found that the testimony revealed "only that defendant contacted his attorney and that his attorney was present at a police interview."   *Id.*   It further noted that even if the testimony was viewed as substantive evidence, "admission of substantive evidence of testimony concerning a

defendant's silence *before* custodial interrogation and *before Miranda* warnings have been given is not a violation of the defendant's constitutional rights." *Id.* (emphasis in original). The state court's ruling on this issue preceded is supported by the Supreme Court's subsequent ruling in *Salinas v. Texas*, 133 S. Ct. 2174 (2013) (holding that prosecutors may use a defendant's pre-arrest silence as substantive evidence of his guilt if the defendant did not expressly invoke his right to remain silent).   The Michigan Court of Appeals' finding that the testimony did not amount to an improper comment on petitioner's exercise of his rights to an attorney and to remain silent is reasonable. Thus, it is not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner also argues that the prosecutor improperly elicited testimony that a search warrant was needed to obtain his blood sample.   Petitioner sought to exclude testimony that because he would not otherwise volunteer a sample, police obtained a search warrant for his blood.   The trial court held that the prosecutor could elicit testimony that a search warrant was obtained and a blood sample taken pursuant to that warrant, but not testimony that the officers obtained a search warrant because petitioner would not provide a sample without a warrant. *Spagnola*, 2009 WL 2382670, at *25.   The record shows that the prosecutor complied with this order.

Next, petitioner argues that the prosecutor and sheriff's department failed to investigate the case in good faith.   He argues that, had they done so, he would have been able to prove his theory that either Jeff Rohl or Ron Fein committed the murder.   The Michigan Court of Appeals found no indication in the record that the police or prosecution suppressed evidence, engaged in misconduct, or exercised bad faith. *Spagnola*, 2009 WL 2382670, at *28.   A state prosecutor is obligated under the United States Constitution to disclose to a defendant exculpatory evidence only of which he is aware. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   There is no

24

corresponding constitutional duty to fully investigate defendant's theory of the crime or seek out such evidence.   Petitioner fails to show that the prosecutor engaged in misconduct in this regard.

Petitioner further argues that the prosecutor engaged in misconduct by testifying to facts not in evidence.   Specifically, he challenges the prosecutor's comment in closing argument regarding the testimony of petitioner's mother, Wanda Spagnola, providing petitioner an alibi. Wanda testified that she was recovering from bladder surgery at the time of the murder.   On the night of the murder, she got up at about 1:00 a.m. and 3:30 a.m. to change her catheter bag. She testified that both times she got up, she saw petitioner sleeping on the couch.   The prosecutor asked Wanda, who had worked at a hospital for over seven years, whether she was familiar with an all-night catheter bag, which had a valve to prevent the back-flow of urine.   She replied that she had never seen one.   Despite this testimony, the prosecutor argued during his closing that "[c]ertainly her doctor would want her to use a bag – a large overnight bag that had a valve that prevented backup."   *Spagnola*, 2009 WL 2382670, at *29.   Defense counsel immediately objected on the ground that no such testimony had been presented.   The trial court provided a curative instruction: "if the argument is not supported by the evidence, you may disregard it – and you should disregard it if it's not supported by the evidence as you find it."   *Id.*   On direct appeal, the prosecutor admitted that the argument was not supported by evidence, but maintained that the trial court's instruction cured his misstatement.   The Michigan Court of Appeals agreed, finding no reason to believe that the jurors ignored the instruction.   *Id.* at *30.

Jurors are generally presumed to follow their instructions.   *Penry v. Johnson*, 532 U.S. 782, 799 (2001).   There is no evidence that they failed to do so in this case.   The state court was not unreasonable in concluding that the prompt instruction cured the misstatement.

25

Petitioner next argues that in closing argument the prosecutor misstated testimony adduced regarding a tire track found near where the victim was buried.   The prosecutor stated that the tire track impression collected from the site was very poor quality, but that the tire track "kind of matched the one that was on defendant's Chevette."   *Spagnola*, 2009 WL 2382670, at *30. Defense counsel immediately objected on the ground that the testimony did not support the prosecutor's statement.   The trial court instructed the jury to disregard any argument not supported by the evidence.   The prosecutor's remaining argument regarding the tire track correctly stated that the forensic expert testified that petitioner's Chevette could not be excluded. *Id.* at *31.   The Michigan Court of Appeals held that the inaccuracy of the prosecutor's initial argument about the tire track evidence was cured by the trial court's instruction.   *Id.*   The Court agrees.   While the prosecutor's initial statement was inaccurate, following the objection and the trial court's curative instruction the prosecutor accurately characterized the evidence as simply failing to exclude Petitioner's vehicle.   The Court finds no error.

Petitioner also argues that the prosecutor misstated evidence when he argued that Jacob and Shane saw petitioner running down the road after they left the Fein residence.   The prosecutor reviewed the timeline of the crime alongside petitioner's alibi and stated: "[A]fter the boys got out the window and ran next door and pounded on the neighbor's doors, . . . they saw the defendant running down the road."   *Id.* at *32.   Defense counsel objected on the ground that neither boy testified that they saw petitioner.   The trial court overruled the objection on the ground that closing argument allowed for some leeway.   The Michigan Court of Appeals held that the prosecutor's argument did not amount to misconduct, stating, in relevant part:

> The context of the challenged comment allows an interpretation that
> the prosecutor made the comment in reference to the timeline of the
> murder and how based on the known times involved, defendant

26

> could have committed the murder and therefore been the man they saw running down the road.   A prosecutor is free to argue that the evidence and all reasonable inferences arising from it that demonstrates that the defendant is guilty.  *Bahoda*, *supra* at 282, 531 N.W.2d 659.   To the extent the comment can be interpreted as an identification of defendant himself running down the road, it would be, as defendant argues, a misstatement of the evidence.   But defendant objected and the trial court immediately instructed the jury that it was argument.   Later the court instructed the jury to base its decision only on the evidence and that the lawyers' comments were not evidence.   Jurors are assumed to follow a court's instructions; therefore, any prejudicial effect of the prosecutor's closing argument would have been cured by the trial court's jury instructions.  *Green*, *supra* at 693, 580 N.W.2d 444.

*Id.*  The prosecutor's statement was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial."  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (1997) (internal quotation omitted).   Additionally, the trial court correctly cautioned the jurors that what the lawyers said was not evidence.  *See United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) ("Ordinarily, a court should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may cure the error."). Petitioner presents no evidence to suggest that the prosecutor intentionally made improper statements.   The Court concludes that the state court's decision constituted a reasonable application of established Supreme Court precedent.

The prosecutor's argument regarding the duct tape evidence is the focus of Petitioner's next claim.   Specifically, Petitioner challenges the prosecutor's argument that there were fewer than 100 rolls of duct tape in Berrien County that could have been the source of the tape found on Petitioner's vehicle and the victim's head.   Carter MacFarland, a quality assurance manager for ShurTape Technologies, a duct tape manufacturer, testified that the tape at issue in this case was manufactured by ShurTape Technologies and branded as Ace for Ace Hardware

27

Stores.  *Spagnola*, 2009 WL 2382670, at *32.   He estimated that between 300,000 and 400,000 rolls of that type of tape were distributed to Ace Stores in the United States over a near two-year period.   During closing argument, the prosecutor extrapolated that, because the 300,000 to 400,000 rolls of duct tape were distributed to Ace Hardware stores throughout the entire country, it was probable that fewer than 100 rolls of duct tape were sold in Berrien County.   *Id.* at *33.   The prosecutor stated that based on the evidence it was likely that the duct tape on petitioner's Chevette was from the same roll of duct tape used on the victim.   Defense counsel objected to the prosecutor's characterization of the duct tape evidence.   The trial court again advised the jury that they could reject any argument not supported by the evidence.   The Michigan Court of Appeals held that the prosecutor's argument was based upon reasonable inferences drawn from MacFarland's testimony.   *Id.*   While there was no direct evidence regarding the number of rolls of duct tape sold in Berrien County, the prosecutor was free to argue that, based upon MacFarland's testimony, one could infer that fewer than 100 rolls were sold in Berrien County. As directed by the trial court, the jury was free to adopt or reject the prosecutor's argument.   The Court finds that the Michigan Court of Appeals' conclusion that the prosecutor's argument was a reasonable inference, not a misstatement of facts, is not contrary to or an unreasonable application of *Darden.*

Petitioner further challenges the prosecutor's closing argument on the ground that the prosecutor improperly vouched for the credibility of prosecution witnesses.   Prosecutors may not vouch for a witness's credibility.   Prosecutorial vouching and an expression of personal opinion regarding the accused's guilt

> pose two dangers: such comments can convey the impression that
> evidence not presented to the jury, but known to the prosecutor,
> supports the charges against the defendant and can thus jeopardize

28

> the defendant's right to be tried solely on the basis of the evidence
> presented to the jury; and the prosecutor's opinion carries with it the
> imprimatur of the Government and may induce the jury to trust the
> Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18–19 (1985).

First, Petitioner asserts that the prosecutor engaged in improper vouching when he stated, "I also think there was a very real chance that defendant made a copy of that key that was kept in that rock outside." *Spagnola*, 2009 WL 2382670, at *34. The Michigan Court of Appeals held that the prosecutor's comment was based on trial testimony and reasonable inferences from that testimony. *Id.* Jacob and Ron Fein both testified that Lisa kept a spare key to the house hidden in a fake rock. Detective Sergeant Michael Danneffel testified that Jacob told him that he had told petitioner about the key. It was reasonable for the prosecutor to infer from that testimony that petitioner obtained a copy of the key. The Court finds no misconduct.

Second, petitioner contests the prosecutor's argument that it was petitioner who committed the murder, not Ron Fein. The Michigan Court of Appeals found the prosecutor's argument proper, noting that the prosecutor followed this statement with a summary of evidence implicating petitioner and exculpating Ron Fein. *Id.* The prosecutor is certainly free to argue that the evidence presented supports a finding of a defendant's guilt.

Third, petitioner objects to this argument by the prosecutor: "But I think the biggest thing – the biggest reason why defendant wanted custody, and the evidence is clear on this, the defendant did not believe that Lisa was morally fit enough to have custody of Jacob." *Id.* The Michigan Court of Appeals found that this argument was supported by the evidence:

> The evidence showed that defendant, at a minimum, believed Lisa
> was having affairs with other men, that she was critical and
> manipulative, she liked to "party," and that she did not love Jacob.
> There was also evidence that defendant believed that he was a

> morally fit, ideal parent, totally in contrast to Lisa.   Defendant has
> not shown error where the prosecutor was arguing from the facts in
> evidence and not that he had some special knowledge regarding the
> truthfulness of a witness.

*Id.*   The record shows ample evidence from which the prosecutor could fairly argue that Petitioner

believed Lisa was not morally fit to parent Jacob; thus, the Michigan Court of Appeals' conclusion

is fully supported by the record.   Habeas relief is denied on this claim.

Finally, Petitioner argues that the cumulative effect of the prosecutorial misconduct

warrants habeas relief.   The Court has found no instances of misconduct.   Meritless individual

claims of error cannot by accumulation create constitutional infirmity.   *See Campbell v. United

States*, 364 F.3d 727, 736 (6th Cir. 2004) ("[T]he accumulation of non-errors cannot collectively

amount to a violation of due process.").

### e.  <u>Right to an Impartial Jury (Claim VIII)</u>

Petitioner claims that his right to an impartial jury was violated by the inclusion of

Byron Hatch, a biased juror who ultimately served as foreperson.   During *voir dire*, Hatch stated

that he knew Barrett Fanning, one of the listed potential prosecution witnesses.   *Spagnola*, 2009

WL 2382670, at *36.   He stated that he and Fanning had been neighbors.   He had provided

shelter for Fanning's ex-wife and her children before she divorced Fanning.   Hatch stated that he

would not find Fanning to be a credible witness.   *Id.*   He further stated that he had formed no

opinion on the case and that he could be fair and impartial to both sides.   *Id.*   Neither the defense

nor prosecution exercised challenges to Hatch, and the defense expressed satisfaction with the

jury.   Ultimately, Fanning did not testify.   But on the thirteenth day of the trial, Hatch informed

the bailiff that he had seen Barrett Fanning's ex-wife, Debbie Fanning, in the courthouse hallway.

*Id.*   She had been listed on the defense witness list under a different name, Deborah Nosseck.

The defense and prosecution both consented to leaving Hatch on the jury.  Nosseck briefly testified for the defendant that she was close friends with Lisa Fein and that Lisa was not afraid of petitioner, likening petitioner to a disapproving, "nagging mother."  *Id.*

Almost a year after sentencing, petitioner filed a motion for a new trial raising a juror bias claim.  He attached an affidavit from Nosseck in which Nosseck states that she became friends with Hatch and his wife when she and her then-husband Barrett Fanning moved next door to the Hatches.  *See* Nosseck Affidavit, ECF No. 2-8, Pg. ID 9.  She stated that during the approximately two years she lived next door to Hatch, she discussed Lisa and the circumstances of her marriages to Ron Fein and Frank Spagnola many times.  *Id.*  Nosseck said that they theorized about who murdered Lisa and that Hatch identified Spagnola as a primary suspect.  *Id.*  Nosseck also stated that Hatch expressed a desire to serve as a juror for the trial.  *Id.*  Petitioner argues that Hatch was a "stealth juror" and that his presence on the jury denied petitioner his right to an impartial jury.  The trial court rejected this claim, finding that Hatch was candid in his answers and stated that he knew Deborah Nosseck on his own initiative.

The Michigan Court of Appeals also denied the claim, finding, in relevant part:

> "[J]urors are 'presumed to be ... impartial, until the contrary is shown.'"  *Miller*, *supra* at 550, 759 N.W.2d 850 quoting *Holt v. People*, 13 Mich. 224, 228 (1865).  "The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt."  *Id.*, *citing Holt, supra*. We have carefully reviewed Nosseck's affidavit and have found nothing indicating bias on the part of Hatch against either party.  *Id.* Further, . . . considering that Juror Hatch was friendly with Nosseck, a defense witness, it would seem that Hatch would have been more sympathetic toward defendant.  *Id.*, *supra* at 554-555, 759 N.W.2d 850.  Moreover, Hatch voluntarily and candidly revealed his knowledge and opinions regarding prospective witnesses as soon as he realized who they were during the course of trial.  Hatch also clearly stated during *voir dire* that he had not formed an opinion about the case, and Nosseck's affidavit does not rebut this point or

31

> even call it into reasonable doubt.  *Id.* at 550, 759 N.W.2d 850,
> *citing Holt, supra*.   Defendant has failed to show that he was denied
> the right to an impartial jury.   *Id*. at 548-549.

*Spagnola*, 2009 WL 2382670, at *38.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."   U.S. Const. amend. VI. The right to an impartial jury is made applicable to the states by the Fourteenth Amendment. *Turner v. Louisiana*, 379 U.S. 466 (1965).   "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."   *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).   "The presence of even a single biased juror deprives a defendant of his right to an impartial jury."   *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004).

The first question when considering juror bias, is whether the juror swore under oath "'that he could set aside any opinion he might hold and decide the case on the evidence,' and whether that 'protestation of impartiality' ought to be believed."   *Id.* (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).   A "state court's finding of impartiality is a factual determination entitled to 28 U.S.C. § 2254(e)'s presumption of correctness."   *Id.*   If a juror has not deliberately concealed information, "the movant must show *actual bias*."   *Id.*  (emphasis in original).

The Michigan Court of Appeals applied the correct standard of review and petitioner has not rebutted the presumption of correctness afforded the state court's finding that the juror was impartial.   Therefore, petitioner has not shown that the state court's decision was contrary to or an unreasonable application of Supreme Court precedent.

Accordingly,


IT IS ORDERED that the petition for a writ of habeas corpus is dismissed.

IT IS FURTHER ORDERED that a certificate of appealability is denied because petitioner has failed to make a substantial showing of the denial of a federal constitutional right, and leave to appeal *in forma pauperis* is denied because the appeal would be frivolous.   *See Dell v. Straub,* 194 F. Supp. 2d 629, 659 (E.D. Mich. 2002).

_s/ Bernard A. Friedman_____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:   April 3, 2017
       Detroit, Michigan